IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JAMES JESTER,                    *
                                 *
                                 *
        Plaintiff,               *
                                 *
           v.                    *          CV 121-100
                                 *
WARDEN TED PHILBIN, et al.,      *
                                 *
        Defendants.              *
                                 *
                                 *

ORDER

Before the Court are Plaintiff's motion for leave to file an amended complaint and Defendants' motion for summary judgment. (Docs. 53, 47.)  For the following reasons, Plaintiff's motion is **DENIED** and Defendants' motion is **GRANTED**.

## I. BACKGROUND

The Court sets out the relevant facts below from the pleadings and supporting papers submitted in this case.

### A. Procedural History

On June 23, 2021, Plaintiff filed his original Complaint under 42 U.S.C. § 1983 asserting that Defendants, in their individual capacities, violated his religious rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA) and his right to be free from cruel and unusual

punishment under the Eighth Amendment. (Compl., Doc. 1.) Plaintiff claims he was prevented from wearing his Rastafarian beanie and was injured by Defendants after refusing a haircut based on his Rastafarian religious beliefs on or about June 25, 2019. (Id. at 2-3.) The last day to amend pleadings or add parties was October 5, 2021. (See Doc. 20.) Discovery closed on February 28, 2023 after the Parties were granted six extensions by the Court. (Doc. 40.) The October 5, 2021 deadline to amend pleadings and add parties, however, remained in full force and effect. (See Doc. 25.) Defendants filed their motion for summary judgment on April 14, 2023 (Doc. 47), Plaintiff responded on May 5, 2023 (Doc. 54.), and Defendants replied on May 19, 2023 (Doc. 56). Before filing his response to Defendants' motion for summary judgment, Plaintiff filed a motion to amend his complaint on May 2, 2023. (Doc. 53.) In his motion to amend, Plaintiff requests to add Georgia Department of Correction ("GDOC") as a party, to sue all Defendants in their official capacities, and to add additional counts alleging violation of his First Amendment and RLUIPA rights for not being allowed to congregate with fellow Rastafarians to worship "Jah." (Doc. 53, at 1.) Defendants filed an objection to Plaintiff's motion to amend on May 11, 2023. (Doc. 55.)

**B. Undisputed Facts**

An overview of the undisputed, underlying facts is as follows. When the events in question occurred, Plaintiff was an inmate in

the custody of the GDOC, and he was housed at Augusta State Medical Prison ("ASMP") where Defendant Philbin was the warden and Defendants Lance Briley, Cordero Campbell, Efrin Lopez, Listopher Scott, Jason Smith, and Osjha Taylor (collectively, the "Cert Defendants") were members of the Correctional Emergency Response Team ("CERT"). (Defs.' Statement of Undisputed Material Facts ("SUMF"), Doc. 47-2, ¶¶ 1-3; Pl.'s SUMF, Doc. 54-1, at 1.) GDOC's Standard Operating Procedure ("SOP"), in effect at all times relevant to this lawsuit, details the process by which an inmate may seek a religious accommodation, including deviation from the personal grooming standards set out by the institution and requests for religious paraphernalia. (Defs.' SUMF, ¶¶ 8-13; Pl.'s SUMF, at 1; Ex. H. to Pl.'s Br. Opp. Summ. J., Doc. 54-3, at 98-100.) To receive such an accommodation, inmates must file a Special Request form to initiate the Special Religious Request process. (Defs.' SUMF, ¶¶ 9-13; Pl.'s SUMF, at 1.) A decision from the legal department concerning the Special Religious Request process must be completed within 30 days from the time the inmate gives his counselor the request. (Defs.' SUMF, ¶ 20; Pl.'s SUMF, at 1.) Plaintiff never filed a request for a religious exemption as outlined in the SOP to have his hair longer than the requisite three inches. (Defs.' SUMF, ¶¶ 26, 29; Pl.'s SUMF, at 1.)

On June 25, 2019, Defendant Philbin came to Plaintiff's dorm, and even though Plaintiff was wearing a beanie cap, Defendant

Philbin noticed Plaintiff's hair was over three inches long, in violation of prison rules. (Defs.' SUMF, ¶¶ 31-32; Pl.'s SUMF, at 1.) Defendant Philbin ordered Plaintiff to have his hair cut to comply with prison rules, but Plaintiff refused. (Defs.' SUMF, ¶ 34; Pl.'s SUMF, at 1.) The next day, Plaintiff was placed into a segregation cell where he was approached by the CERT Defendants. (Defs.' SUMF, ¶¶ 35-36; Pl.'s SUMF, at 1.) The entire encounter between Plaintiff and the CERT Defendants was recorded. (Defs.' SUMF, ¶ 36; Pl.'s SUMF, at 1; Ex. C. to Def. Mot. Summ. J. ("Encounter Video"), Doc. 47-5.)

During this encounter, the CERT Defendants repeatedly asked Plaintiff to allow himself to be handcuffed, but Plaintiff refused even after warnings that he would be forcefully handcuffed if he did not comply with the CERT Defendants' request. (Defs.' SUMF, ¶¶ 37, 39; Pl.'s SUMF, at 1; Encounter Video, at 0:49-01:26.) Instead, Plaintiff stated repeatedly that "he would not" come to the gate of his cell to be handcuffed and that the officers would have to "kill [him] today." (Defs.' SUMF, ¶¶ 37, 40; Pl.'s SUMF, at 1; Encounter Video, at 0:49-01:29, 01:05-01:06.) Defendant Briley pleaded with Plaintiff to cut his hair in compliance with the prison rules, but Plaintiff still refused. (Defs.' SUMF, ¶ 38; Pl.'s SUMF, at 1; Encounter Video, at 01:27-01:30.) After Plaintiff refused to comply with the CERT Defendants' multiple requests to "come to the gate" and be handcuffed, the CERT

4

Defendants entered Plaintiff's cell and ordered Plaintiff to "turn around and be cuffed up," but he still did not comply. (Encounter Video, at 01:29-01:35.)   The CERT Defendants then attempted to subdue Plaintiff by tasing and pepper spraying him. (Defs.' SUMF, ¶ 41; Pl.'s SUMF, at 1; Encounter Video, at 01:36-1:40.) Defendants then instructed Plaintiff to "get on the ground." (Encounter Video, at 01:39-1:42.)   When Plaintiff still did not comply, Defendants pushed him with a shield against the wall, and then to the ground, while repeatedly asking for Plaintiff's hands to handcuff him. (Defs.' SUMF, ¶ 42; Pl.'s SUMF, at 1; Encounter Video, at 01:36-2:21.)   While Defendants held Plaintiff down as they tried to secure him with handcuffs, Plaintiff said "you're choking me" and "I can't breathe." (Encounter Video, at 2:00-2:02, 2:10-2:12.)   After Plaintiff was handcuffed on the ground, the officers stopped force within seconds. (Defs.' SUMF, ¶ 44; Pl.'s SUMF, at 1; Encounter Video, at 2:22-2:26.)   As Plaintiff stood up, he complained his leg was hurting him, so the CERT Defendants placed him in a wheelchair and escorted him to the medical office for medical treatment. (Defs.' SUMF, ¶¶ 45-46; Pl.'s SUMF, at 1; "Encounter Video," at 2:32-14:40.)

## C. Disputed Facts

Plaintiff contends that when Defendant Philbin first confronted Plaintiff about his hair length, he also confronted him about wearing a Rastafarian beanie cap. (Pl.'s Br. Opp. Summ. J.,

54-2, at 1.)  Plaintiff alleges the Chaplain gave him this beanie after he had gone through the appropriate approval process to it and there was no way the beanie would have reached him if it was not approved. (Pl.'s Br. Opp. Summ. J., at 3-4.)  Plaintiff claims he showed Defendant Philbin an approval form he received from the Chaplain allowing him to wear his beanie.  (Id. at 4.) Nevertheless, Plaintiff contends Defendant Philbin instructed Plaintiff to remove the beanie when he was inspecting Plaintiff's hair length.  (See Compl., at 8, 13.)  The next day, Plaintiff claims, "[o]ne of the Defendants jerked [it] off of his head" when officers approached him to enforce the hair length policy.  (Id. at 9.)  Plaintiff asserts in his Complaint that "forbidding [Plaintiff from wearing his Rastafarian beanie . . . is not the least restrictive means of furthering any compelling government interest" and that he was "prevent[ed] . . . from wearing his Rastafarian beanie" in violation of his religious beliefs.  (Id. at 14-15.)

Defendants contend Plaintiff never applied for or received approval for the beanie.  (Defs.'s Br. Supp. Summ. J., Doc. 47-1, at 1 ("[Plaintiff] never sought any religious accommodations for his Rastafarian practice."))

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must "draw all justifiable inferences in his favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir.

7

1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movants have met their initial burden of showing there are no genuine issues of material fact and they are entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citation omitted). The

8

non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Plaintiff notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 49.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.  The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

### III. ANALYSIS

Plaintiff moves for leave to amend to add GDOC as a party, to sue all Defendants in their official capacities, and to add additional counts alleging violation of his First Amendment and RLUIPA rights for not being allowed to congregate with fellow Rastafarians to worship "Jah."  (Doc. 53.)  Defendants move for summary judgment on all counts asserting the following: (1) Plaintiff cannot show a First Amendment Free Exercise or RLUIPA religious rights violation; (2) Plaintiff cannot show an Eighth Amendment excessive force violation; and (3) Defendants in their

individual capacity are entitled to qualified immunity. (Defs.'s Br. Supp. Summ. J.)   The Court addresses these arguments below.

**A. Plaintiff's Motion for Leave to Amend Complaint**

Plaintiff moved for leave to amend his complaint under Federal Rule of Civil Procedure 15(a).   (Doc. 53, at 1; Doc. 53-1, at 3.) But, because Plaintiff's motion to amend was filed after the scheduling order's deadline, he must first demonstrate good cause under Rule 16(b) before the Court will consider whether amendment is proper.   See Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419, 1418 n.2 (11th Cir. 1998) ("[W]hen a motion to amend is filed after a scheduling order deadline, [Federal Rule of Civil Procedure] 16 is the proper guide for determining whether a party's delay may be excused.").   "If [the Court] considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." Id. at 1419.

Rule 16(b)(4) states, "[a] schedule may be modified only for good cause and with the judge's consent."   Fed. R. Civ. P. 16(b) (4).   "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'"   Sosa, 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment).

> The lack of diligence that precludes a finding of good
> cause is not limited to a plaintiff who has full
> knowledge of the information with which it seeks to amend
> its complaint before the deadline passes.  That lack of
> diligence can include a plaintiff's failure to seek the
> information it needs to determine whether an amendment
> is in order.

S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241 n.3 (11th

Cir. 2009).

> The Eleventh Circuit has further stated:

> It is not an abuse of discretion for a district court to
> deny a motion for leave to amend a complaint when such
> motion is designed to avoid an impending adverse summary
> judgment.  Furthermore, it is not an abuse of discretion
> for a district court to deny a motion for leave to amend
> following the close of discovery, past the deadline for
> amendments and past the deadline for filing dispositive
> motions. . . .    [I]n order to ensure the orderly
> administration of justice, [the court] has the authority
> and responsibility to set and enforce reasonable
> deadlines.

Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th

Cir. 2002) (citations omitted).

In the instant case, Plaintiff filed this motion almost two

years after his initial Complaint, a year and seven months after

the applicable amendment deadline set forth in the scheduling

order, and more than two months after discovery closed.

Furthermore, Plaintiff's motion to amend followed closely behind

Defendants' filing for summary judgment.  Given the timing of this

motion, "Rule 16 is the proper guide for determining whether

[Plaintiff's] delay may be excused," Sosa, 133 F.3d at 1418 n.2,

and, therefore, the appropriate inquiry is whether Plaintiff has

shown good cause for the delay in filing his motion.  Fed. R. Civ.
P. 16(b)(4).  The good cause standard "precludes modification [of
the scheduling order] unless the schedule cannot be met despite
the diligence of the party seeking the extension." Sosa, 133 F.3d
at 1418.  Indeed, "[i]f [a] party was not diligent the [good cause]
inquiry should end." Johnson v. Mammoth Recreations, Inc., 975
F.2d 604, 609 (9th Cir.1992).

Plaintiff fails to present any new evidence or other legal
grounds to demonstrate good cause for his delay; nor does he
provide any information in his motion from which the Court could
infer that despite diligent efforts the new claims and new
defendants could not have been added within the scheduling
deadline.[1]  Therefore, the Court finds that Plaintiff has failed
to show good cause as to why the deadline for filing motions to
amend could not be met in this instance.

Even if the more lenient Rule 15(a) were applicable to this
motion, Plaintiff still falls short of showing that he is entitled
to leave to amend.  Because Plaintiff's motion falls outside of
the time period in which he could amend his complaint as a matter
of course, he can amend "only with the opposing party's written
consent or the court's leave." Fed. R. Civ. P. 15(a)(1)-(2).  Rule

---

[1] Plaintiff's memorandum of law in support of his motion for leave to file an
amended complaint cuts off mid-sentence (Doc. 53-1, at 4), so it appears to the
Court that Plaintiff failed to attach its entire motion.  Nevertheless, the
Court considers the motion as submitted.

15 provides "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend, however, is not automatic even under Rule 15's permissible standard. <u>Faser v. Sears, Roebuck & Co.</u>, 674 F.2d 856, 859-60 (11th Cir. 1982). Amendment must be freely given only "[i]n the absence of any apparent or declared reason," such as undue delay, prejudice to the opposing party, or futility of amendment. <u>Rosen v. TRW, Inc.</u>, 979 F.2d 191, 194 (11th Cir. 1992) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)). An amendment is futile when the complaint would still be subject to dismissal. <u>Chen ex rel. v. Lester</u>, 364 F. App'x 531, 538 (11th Cir. 2010) (citation omitted); <u>see also Hall v. United Ins. Co. of Am.</u>, 367 F.3d 1255, 1263 (11th Cir. 2004) ("[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.").

Here, Plaintiff requests to amend to add GDOC as a party, to sue all Defendants in their official capacities, and to add additional counts alleging violation of his First Amendment and RLUIPA rights for not being allowed to congregate with fellow Rastafarians to worship "Jah." (Doc. 53, at 1.) Both his requests to add GDOC as a party and to sue all Defendants in their official capacities are futile as they are barred by the Eleventh Amendment, which applies to state entities. <u>See Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985) ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages

action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (citations omitted)); Stevens v. Gay, 864 F.2d 113, 115 (11th Cir. 1989) (affirming dismissal of a claim against the Georgia Department of Corrections because it is a state entity entitled to Eleventh Amendment immunity).

As to Plaintiff's request to add additional counts under the First Amendment and RLUIPA, it is unclear whether these claims stem from the same facts as the original Complaint or if they rely on different facts. If the claims arise from the same facts as the pending claims, then they are futile because the statute of limitations has run, and Plaintiff makes no argument as to why tolling would be appropriate. Crowe v. Donald, 528 F.3d 1290, 1292 (11th Cir. 2008) (explaining that the statute of limitations for § 1983 is two years in Georgia) (citing McNair v. Allen, 515 F.3d 1168, 1173 (11th Cir. 2008); O.C.G.A § 9-3-33).

Even if Plaintiff's new claims were not futile for the reasons stated above, his undue delay and the prejudice to Defendants based on this delay is apparent and would be basis enough for the Court to deny the motion to amend. See Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999) ("Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." (citing Jameson v. Arrow Co., 75 F.3d 1528, 1534 (11th Cir.

1996))). Plaintiff gives no explanation for why he waited so long to file this motion to amend. As outlined above, Plaintiff's motion is late by more than a year, discovery is closed, and the case has moved into summary judgment. For the foregoing reasons, Plaintiff's motion for leave to file an amended complaint is **DENIED**.

## B. Defendants' Motion for Summary Judgment

Defendants contend they are entitled to summary judgment on all of Plaintiff's claims because Plaintiff cannot show either a religious rights violation or an Eight Amendment excessive force violation.

### 1. Free Exercise and RLUIPA Claims

Plaintiff alleges Defendants' conduct violated his religious rights under the First Amendment Free Exercise Clause and RLUIPA.

#### a. *Hair Length*

Plaintiff alleges he was injured after refusing a haircut based on his religious beliefs, and that this injury and haircut were a violation of his rights under First Amendment Free Exercise Clause and RLUIPA.

An essential element of both claims brought under the Free Exercise Clause and RLUIPA is the plaintiff must show his religious exercise was substantially burdened. See Wilkinson v. GEO Grp., Inc., 617 F. App'x 915, 917 (11th Cir. 2015) ("To establish a violation of his right to free exercise, [Plaintiff] must first

establish that a state actor imposed a '*substantial burden*' on his practice of religion." (citing <u>Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater</u>, 2 F.3d 1514, 1549 (11th Cir. 1993) (emphasis added))); 42 U.S.C. § 2000cc-1 ("No government shall impose a *substantial burden* on the religious exercise of a person residing in or confined to an institution . . . .") (emphasis added); <u>Smith v. Allen</u>, 502 F.3d 1255, 1276 (11th Cir. 2007), *overruled on other grounds by* <u>Hoever v. Marks</u>, 993 F.3d 1353 (11th Cir. 2021) ("To establish a prima facie case under section 3 of RLUIPA, a plaintiff must demonstrate 1) that he engaged in a religious exercise; and 2) that the religious exercise was *substantially burdened*." (emphasis added) (citations omitted)).

A "substantial burden" is a "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."   <u>Smith</u>, 502 F.3d at 1277 (internal quotations and citation omitted).   This includes "pressure that tends to force adherents to forego religious precepts or . . . that mandates religious conduct." <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1227 (11th Cir. 2004). "[T]he government's action must be 'more than . . . incidental' and 'must place more than an inconvenience on religious exercise.' That is, to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice."

<u>Smith</u>, 502 F.3d at 1277 (alteration in original) (quoting <u>Midrash</u>, 366 F.3d at 1227).

Here, it is undisputed that Plaintiff never utilized GDOC policies to seek an exemption from grooming policies to grow his hair longer than three inches.[2]  (<u>See</u> Defs.' SUMF, ¶ 29; Pl.'s SUMF, at 1; <u>see also</u> Pl.'s Br. Opp'n. Summ. J., at 4 ("Plaintiff did not send in a formal request to grow his hair because he believed once he was recognized by [GDOC] as Rastafarian, he was authorized to grow his hair longer than the 3-inch requirement.").) Filling out a request for accommodation form and waiting 30 days for its review is only "incidental" and nothing more than an "inconvenience on religious exercise."  <u>See Smith</u>, 502 F.3d at 1277.  The Eleventh Circuit has found that having to comply with similar policies that require requesting accommodation for a religious belief is not a substantial burden on religious practice. <u>See Dorman v. Aronofsky</u>, 36 F.4th 1306, 1314 (11th Cir. 2022) (affirming that having inmates "register for Passover 45 days in advance [was] not a substantial burden on their Jewish faith under

---

[2] Plaintiff contends there is dispute of fact as to whether he was recognized as Rastafarian and whether he was permitted to purchase and wear a beanie in accordance with his religious beliefs.  (<u>See</u> Pl.'s Br. Opp'n. Summ. J., at 8-9.)  These facts, however, are not material to his free exercise and RLUIPA claims that the enforcement of the grooming policy at GDOC violated his religious freedoms.  GDOC policy sets out procedures inmates must follow for exceptions from the grooming policy, and there is no indication in these procedures that recognition as certain religious belief or being granted other accommodations would automatically entitle an inmate to additional accommodations without first requesting them.  (<u>See</u> Ex. H to Pl.'s Br. Opp'n Summ. J., 54-3, at 98-100.)

the RLUIPA"); <u>Konikov v. Orange Cnty.</u>, 410 F.3d 1317, 1323–24 (11th Cir. 2005) (finding that an ordinance requiring religious leaders to apply for a special exception in order to operate a "religious organization" did not constitute a substantial burden).   As Plaintiff never requested an accommodation to grow his hair out in the first place, he was never granted nor denied the accommodation under GDOC's policies.   Thus, Plaintiff cannot show Defendants created a substantial burden that prevented him from growing his hair out in exercise of his religious beliefs.

Because Plaintiff cannot show that GDOC's grooming policy, as applied to him, substantially burdened his religious practice, there is no question of material fact as to an essential element of his claim and summary judgment is appropriate on his free exercise and RLUIPA claims.   See <u>Clark</u>, 929 F.2d at 606–08 (explaining summary judgment is appropriate when a movant, who does not have the burden of proof at trial, negates an essential element of the non-movant's case).   The Court, therefore, **GRANTS** Defendants' motion for summary judgment as to Plaintiff's free exercise and RLUIPA claims based on enforcement of the grooming policy.

### b. *Rastafarian Beanie*

It is unclear whether Plaintiff also asserts an individual free exercise and RLUIPA claim for violation of his religious rights when he was prevented from wearing his Rastafarian beanie.

In the interests of justice, the Court interprets and analyzes these allegations as an individual claim. Based on this construction, Plaintiff alleges that preventing him from wearing a Rastafarian beanie infringes on his First Amendment free exercise rights.

Prisoners unquestionably retain the rights afforded by the First Amendment; however, many rights are curtailed or limited as a condition of lawful incarceration. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). A "prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable." Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000) (citations omitted). To allow prison officials "to remain the primary arbiters of the problems that arise in prison management," the Court evaluates a prisoner's constitutional claim under a "unitary, deferential standard." Shaw v. Murphy, 532 U.S. 223, 229-230 (2001) (citation omitted). Under that standard, a prison regulation burdening an inmate's exercise of constitutional rights must be "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). To succeed on a constitutional claim, an inmate must show that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90.

Plaintiff contends the enforcement of the prison's policy against beanies would substantially burden the practice of his religion. (Pl.'s Br. Opp'n. Summ. J., at 10.) He also claims the policy is unrelated to a legitimate interest. (Id.) The Eleventh Circuit, however, has found that regulation of religious headwear in prisons is reasonably related to penological interest in "ensuring that inmate apparel does not pose a threat to safety or security in the prison." Hathcock v. Cohen, 287 F. App'x 793, 799-800 (11th Cir. 2008) (concluding that "requiring [an inmate] to obtain approval before wearing his Kufi cap did not violate [his] First Amendment right to practice his Muslim faith").

The question remains whether the policy applied here was reasonable. GDOC procedures leave open alternative methods of exercising the asserted right by allowing Plaintiff to apply for an accommodation on account of his religious beliefs. (Defs.' SUMF, ¶¶ 8-13; Pl.'s SUMF, at 1; Ex. H. to Pl.'s Br. Opp. Summ. J., Doc. 54-3, at 98-100.) Plaintiff contends he applied for and was granted an accommodation based on his religious beliefs. (Pl.'s Br. Opp. Summ. J., at 3-4.)  Even taking Plaintiff's allegations as true — that he did have permission to have and wear this beanie — there is still an issue of whether he was deprived of the beanie in a manner that would violate his First Amendment right to free exercise. While Plaintiff makes general allegations that "forbidding [Plaintiff from wearing his Rastafarian beanie .

20

. . is not the least restrictive means of furthering any compelling government interest" and that Defendants infringed upon Plaintiff's religious beliefs when they "prevent[ed] [him] from wearing his Rastafarian beanie", the only specific allegations in relation to Plaintiff's beanie are that he was asked to remove it during inspection on June 25 and "[o]ne of the Defendants jerked [it] off of his head" on June 26 when officers approached him to enforce the hair length policy.  (Compl., at 8-9, 14-15.)  There are no facts in the record that show the Defendants deprived Plaintiff of his beanie after the inspection or haircut.

Even taking the facts in the light most favorable to him, Plaintiff has not met his burden as to the claim that Defendants violated his First Amendment rights when they removed his beanie for inspection and a haircut.  Eleventh Circuit precedent has consistently upheld the enforcement of grooming policies, including hair length, as rationally related to legitimate penological interests of safety.  See Smith v. Owens, 13 F.4th 1319, 1334 (11th Cir. 2021)(affirming district court's finding that "allowing [the plaintiff] to grow an untrimmed beard presented safety and security risks"); Knight v. Thompson, 797 F.3d 934, 945 (11th Cir. 2015) (recognizing the security, discipline, hygiene, and safety interests in prison policy limiting hair length); Harris v. Chapman, 97 F.3d 499, 503-04 (11th Cir. 1996) (upholding prison hair length regulation against First Amendment and RFRA while

noting compelling interest in prison security); Solomon v. Zant, 888 F.2d 1579, 1582 (11th Cir. 1989) (upholding no beard policy as justified by security interests)). Furthermore, the Eleventh Circuit has found that having to momentarily depart from a religious practice for safety and security reasons is a reasonable request and not a violation of a prisoner's free exercise rights. Rodriguez v. Burnside, 38 F.4th 1324, 1333–34 (11th Cir. 2022) (holding that limiting prisoners to wearing only boxers and shoes to the shower, even for inmates whose religious beliefs did not allow them to be undressed in front of other men, was reasonable as it was rationally related to the prison's legitimate interests in maintaining safe and secure conditions). Therefore, Plaintiff cannot show that being asked to remove his beanie for a hair length inspection and for the resulting haircut were unrelated to penological interests. As he cannot establish an essential element of his claim, summary judgment is appropriate as to Plaintiff's free exercise claim.

RLUIPA, 42 U.S.C. § 2000cc, et seq., provides a greater degree of protection than the First Amendment's Free Exercise Clause, as it requires the government to justify substantial burdens on religious practice by a "compelling, rather than merely a legitimate, governmental interest." Smith, 502 F.3d at 1266 (citation omitted). RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.  A plaintiff must demonstrate "1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened" to succeed on his RLUIPA claim.  Smith, 502 F.3d at 1276.  The statute is to be "construed in favor of a broad protection of religious exercise . . . ."  42 U.S.C. § 2000cc-3(g).

A "religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The Court accepts that wearing a Rastafarian beanie can be a religious exercise.  As such, the Court's focus turns to whether Defendants' prohibition of the beanie created a substantial burden.

As outlined above, "substantial burden" is a "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."  Smith, 502 F.3d at 1277 (internal quotations omitted).  This pressure "must be 'more than ... incidental' and 'must place more than an inconvenience on religious exercise.'"  Id. at 1277 (quoting Midrash, 366 F.3d at 1227).  Again, taking the facts in the non-movant's favor, even if

23

Plaintiff received approval and accommodation to wear a beanie, being asked to remove it for an inspection and a haircut is not more than an incidental pressure or inconvenience on his religious exercise.   For the above reasons, summary judgment is **GRANTED** as to Plaintiff's free exercise and RLUIPA claims based on the prevention of wearing a Rastafarian beanie in exercise of his religious faith.

> 2. Eighth Amendment Excessive Force Claim

The Eighth Amendment's proscription of cruel and unusual punishment governs prison officials' use of force against convicted inmates.   Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999) (citing Whitley v. Albers, 475 U.S. 312, 327 (1986)). Plaintiff must satisfy both an objective and subjective component to prevail on his excessive use of force claim.   See Farmer v. Brennan, 511 U.S. 825, 834 (1994).   Objectively, a plaintiff must show the use of force against him was more than de minimis and caused him to suffer a sufficiently serious deprivation harmful enough to establish a constitutional violation.   Id. (citations omitted); see also Hudson v. McMillian, 503 U.S. 1, 9-10 (1991).

Subjectively, a plaintiff must show the defendant's conduct involved the unnecessary and wanton infliction of pain.   See Whitley, 475 U.S. at 319.   The use of force in and of itself does not violate the Eighth Amendment.   Id.   Rather, the Court should determine "whether force was applied in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm." Harris, 97 F.3d at 505 (quoting Hudson, 503 U.S. at 7)). In considering Eighth Amendment claims, the Supreme Court has noted prison officials often have to make decisions "in haste, under pressure, and frequently without the luxury of a second chance." Farmer, 511 U.S. at 835 (quoting Hudson, 503 U.S. at 6). The Supreme Court has thus accorded wide-ranging deference to prison officials, recognizing their need to preserve order, discipline, and security. Hudson, 503 U.S. at 6. Because the subjective component is contextual, courts consider the following factors: (1) need for application of force, (2) relationship between need and amount of force used, (3) threat reasonably perceived by the responsible officials, (4) any efforts made to temper the severity of a forceful response, and (5) the extent of injury. Id. at 7; Campbell, 169 F.3d at 1375.

Here, there is no genuine issue of material fact as to either the objective or subjective components of the excessive force claim. Plaintiff contends Defendants kept hitting him after he was on the ground with his hands pinned underneath him, all while breaking his leg and choking him even though Plaintiff did not "attack or threaten the CERT team." The video evidence, however, makes clear Plaintiff was aware the CERT team had been assembled and was warned that force, including being tased, would be used if he did not comply with officers' orders. In response to repeated

requests to submit to handcuffs, Plaintiff stated he would not submit to being handcuffed and shouted the officers would "have to kill [him] today" and was otherwise hostile. (Defs.' SUMF, ¶¶ 37, 40; Pl.'s SUMF, at 1; Encounter Video, at 0:49-01:29, 01:05-01:06.) It is also undisputed that Defendant Briley approached Plaintiff attempting to persuade him to submit to having a haircut before any force was used. (Defs.' SUMF, ¶ 38; Pl.'s SUMF, at 1; Encounter Video, at 01:27-01:30.) Moreover, only after Plaintiff continuously refused to comply with Defendants' orders to submit to handcuffs did Defendants use force. (Encounter Video, at 01:29-01:35.)

The Encounter Video shows that Defendants attempted to subdue Plaintiff by tasing and pepper spraying him. (Id. at 01:36-1:40.) Defendant then asked Plaintiff to "get on the ground." (Id. at 01:39-1:42.) When he did not comply, Defendants pushed Plaintiff against the wall with the shield, then moved him to the ground all while repeatedly asking for Plaintiff's hands and moving him to gain control of his hands. (Defs.' SUMF, ¶ 42; Pl.'s SUMF, at 1; Encounter Video, at 01:36-2:21.) Force was removed immediately after Plaintiff hands were available to Defendants and he was cuffed. The entire forceable interaction lasted less than one minute. We do not credit Plaintiff's assertions to the contrary. Scott v. Harris, 550 U.S. 372, 380-81 (2007) ("Respondent's version of events is so utterly discredited by the record that no

reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").   Accordingly, we consider only whether a jury could conclude Defendants violated Plaintiff's Eighth Amendment rights when Defendants applied such force under the circumstances.

Under the objective component, this minimal amount of force was proportional to the degree of risk posed by Plaintiff's behavior.   The force used was de minimis, and it does not rise to the level of being repugnant to the conscience of mankind or contrary to contemporary standard of decency.   See Post v. City Of Fort Lauderdale, 7 F.3d 1552, 1559-60 (11th Cir. 1993) (finding that pushing a plaintiff up against a wall and applying a chokehold to the unresisting plaintiff while affixing handcuffs was de minimis force).   Defendants attempted to temper the severity of the force used, and indeed sought to avoid the use of force altogether.   Accordingly, no reasonable jury could find Defendants used force "maliciously and sadistically to cause harm" to Plaintiff rather than to restore discipline.

As for the subjective component, first, under these circumstances, there is no question the officers had a need to bring Plaintiff under control.   See Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) ("Prison guards may use force when necessary to restore order and need not wait until disturbances

27

reach dangerous proportions before responding."). Second, the relationship between the need to use force and the amount of force used was not excessive under the circumstances. See Marantes v. Miami-Dade Cnty., 649 F. App'x 665, 670 (11th Cir. 2016) (finding that the force employed — knocking a person to the ground, subduing him by holding him down, and employing a chokehold — did not exceed the degree of force necessary to effectuate an arrest). Plaintiff contends the use of five officers, who tased, pepper sprayed, and choked him while forcing him to the ground, in relation to the need to give him a haircut, was excessive. (Pl.'s Br. Opp'n. Summ. J., at 13.) The inquiry, however, is not whether Defendants employed the best method of maintaining order, but whether they acted in a good faith manner to maintain or restore order and not to maliciously cause harm. "[C]ourts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley, 475 U.S. at 322.

Here, the undisputed evidence in the Encounter Video shows Plaintiff was warned multiple times that force would be used if he did not comply, Plaintiff refused to comply even as Defendants

approached him, and Defendants removed force within seconds of handcuffing him. (Encounter Video, at 1:29–2:26.) With respect to the amount and type of force used when one of the Defendants allegedly choked Plaintiff, "it is without question that the use of choking as a means of gaining control over an inmate is a serious and potentially hazardous form of physical force." Cunningham v. Culliver, C.A. No. 10-00114, 2011 WL 6092431, at *9 (S.D. Ala. Nov. 14, 2011). In this instance, however, the amount of force appears to be minimal, as evidenced by the absence of any injury related to the alleged choking, and brief, as the entire forceful encounter lasted less than one minute. Even if Plaintiff was choked during his encounter with Defendants as alleged, the undisputed evidence simply does not support that the Defendants, totally without penological justification, maliciously and sadistically attacked him for the very purpose of causing harm. See id. (granting summary judgment on an excessive force claim against a prison officer related to choking when the amount of force used was minimal, brief, and the plaintiff did not show the choking occurred without any penological justification). Thus, the relationship between the need to use force and the amount of force used was not excessive under the circumstances in this case.

Moreover, the undisputed facts support findings in favor of Defendants as to the third and fourth factors. Plaintiff declined to submit to officers' instruction and be handcuffed, even stating

officers would have to "kill [him] today" in response to multiple requests to comply with officer instructions — which created a reasonably perceived threat by Defendants. Further, it is undisputed Defendants attempted to temper the severity of the force used, and indeed sought to avoid the use of force altogether when Defendant Briley pleaded with Plaintiff to just submit to getting a haircut. Finally, as to the fifth factor, while a broken leg is sufficiently serious, the video evidence does not demonstrate this injury was inflicted by force applied maliciously and sadistically. The Court considers not the extent of the injury but rather the nature of the use of force in determining whether summary judgment is appropriate. See Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010)). Here, the Court finds Defendants applied force in good faith to subdue Plaintiff after he refused to comply with orders, the forceable contact was removed in less than a minute and as soon as Plaintiff was secured, and Defendants immediately got a wheelchair for Plaintiff when he indicated he was injured and escorted him to the medical office for treatment. Thus, Plaintiff cannot establish Defendants used excessive force in violation of his Eighth Amendment rights under the subjective prong. For these reasons, summary judgment is appropriate as to Plaintiff's excessive force claim and is hereby **GRANTED**.

30

### 3. Qualified Immunity

Finally, Defendants move for summary judgment based on qualified immunity, arguing they were acting within their discretionary authority, they did not violate Plaintiff's constitutional rights, and there is no clearly established law that would have put them on fair notice that their conduct here was unlawful. (Defs.'s Br. Supp. Summ. J., at 16-18.)   In response, Plaintiff argues the video sufficiently establishes a constitutional violation occurred. (Pl.'s Br. Opp'n. Summ. J., at 15.)   Although the Court already determined there is no question of fact as to whether Defendants violated Plaintiff's constitutional rights, it addresses qualified immunity out of an abundance of caution.

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (internal quotation marks omitted) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."

Id. (citation and internal quotation marks omitted).   In other
words, "[o]fficials are not liable for bad guesses in gray areas;
they are liable for transgressing bright lines."   Robinson v.
Payton, 791 F.3d 824, 829 (8th Cir. 2015) (quoting Davis v. Hall,
375 F.3d 703, 712 (8th Cir. 2004)).

"To receive qualified immunity, the government official must
first prove that he was acting within his discretionary authority."
Gonzalez, 325 F.3d at 1234 (citing Vinyard, 311 F.3d at 1346).   To
determine whether a government official was acting within the scope
of his discretionary authority, courts consider whether the
official "(a) perform[ed] a legitimate job-related function (that
is, pursuing a job-related goal), (b) through means that were
within his power to utilize."   Holloman ex rel. Holloman v.
Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citing Hill v.
Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir.
1994)).   It is undisputed that Defendants are being sued pursuant
to their duties and were, thereby, acting in their capacities as
GDOC and ASMP officials during all relevant times.   (Defs.' SUMF,
¶¶ 1-2; Pl.'s SUMF, at 1.)   As such, the Court finds they were
acting within the scope of their discretionary authority.

"Once the defendants establish that they were acting within
their discretionary authority, the burden shifts to the plaintiff
to demonstrate that qualified immunity is not appropriate."   Gray
ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006)

(quoting Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003)).  Courts must utilize a two-part framework to evaluate the qualified immunity defense.  First, as a threshold inquiry, the Court addresses whether Plaintiff's allegations, if true, establish a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).

As the Court outlined above, Plaintiff has failed to allege a violation of a clearly establish constitutional right.  Thus, Defendants are entitled to qualified immunity.


## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to file an amended complaint (Doc. 53) is **DENIED** and Defendants' motion for summary judgment (Doc.47) is **GRANTED**.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendants, **TERMINATE** all other pending motions and deadlines, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this $\underline{31}^{st}$ day of October, 2023.


J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA